The next case, United States v. Ignacio Reyes Yanez, has been submitted on the briefs. Same with Slater v. Morton. Singh v. Barr was removed from the calendar and held in abeyance. So now we get to Heber v. Toyota Motor Sales. When you're ready, Counsel. Good morning, Your Honors. May it please the Court, my name is Jerusalem Beligan, and my firm, along with the Kabatock Law Firm, represent the plaintiffs. I would like to reserve five minutes for rebuttal. All right. I'll try to remind you, but keep your eye on the clock, please. Yes, Your Honor. We, as consumers, rely on companies such as Toyota to give us accurate and honest information so we can make an informed decision on whether to buy, lease, or how much to pay for. Counsel, help me with a preliminary issue first. Yes, Your Honor. I understand the general purpose of tort law. The complaint was very long, and frankly, it's hard to find time to read this sort of thing. Rule 8A requires that complaints be concise. I was wondering why it was so long. And going through it, there's all this press release-type language instead of legal-type language. For example, oh, just picking one out at random, at paragraph 179, as will become abundantly clear below, you sure don't need adverbs like abundantly, and you don't need the whole phrase. All you needed in that sentence was, Toyota was aware of the soy wiring defect and its consequences. One of the three sentences there. You don't need anything else there. Every paragraph I look at is that way. There's always junk in it. Frankly, if I were the district judge, which I'm not, and he's entitled to exercise his discretion and not mine, I would have stricken it as not concise and granted leave to amend to file a concise and clear complaint. I had a couple of really key questions, and the answer may be in there, and I can't find it. And the key question for me is, is this kind of, what is the evidence on whether this wiring attracts any more rodents than the old-fashioned type of wiring with plastic covering? Maybe it's in there. I don't know. It takes too long for me to find it. Is there evidence pleaded? Is something pleaded, some facts to show that this wiring attracts rodents more than others? The number of cases was so insignificantly tiny, maybe a few hundredths of 1% of the vehicles, it didn't look like anything. I can't tell. Your Honor, there is. Okay, tell me what paragraph. Well, I don't have the complaint in front of me. You don't? No. You're just saying it's in there somewhere and I should dig through 250 pages and find it? Well, Your Honor, let me take a step back. Your initial question is why. Why did the complaint? No, no. My initial question is, when I got to the question after discussing the problem that I had that prevented me from answering it myself, is where are facts pleaded to show that this kind of wiring attracts more rodent problems than the old-fashioned kind of wiring? It's in the admissions from Toyota's own employees. It's from the admissions. No, no, it isn't. I think what you're referring to there is a couple of service advisors mentioned it, but that's not the same thing as comparing how many rodent problems you get with the new wiring and how many rodent problems you get with the old-fashioned wiring. Well, Your Honor, there's also a market impact summary report that we cited in the complaint. That was a speculation on how many people wouldn't buy these kind of cars if they knew about the change in the wiring. Well, that and also that there has been an increase, steady increase in rodent damage as a result of the soybean wiring defect. And also in that. . . Wait, where is that? This could be helpful. Where is it? I've got it right here. Just tell me where. In the complaint, there's a table of contents that identifies the. . . Okay, I've got the table of contents. I still can't find anything here. Tell me where to look. It's. . . You don't know either. No, I do, Your Honor. I know we. . . I would think you'd have a yellow sticky on that because it's developed in the arguments. The allegations are in the complaint, Your Honor. Somewhere. In the complaint, it actually says the September 10th market impact summary. We also point to the June 2014 field quality report. We also point to the May 2011. . . I'm looking at adverbs again. I'm trying to read this thing. Tellingly, Toyota has received. . . I still can't find it. I'm looking at the table of contents. In the headings, Your Honor, we say that Toyota has known since 2008 that the class vehicles have been. . . Maybe. I can't find it. Heavily impacted. And you can't help me, I guess. You do say generally that soy-based components attract rodents. It's like it's rat food. But I guess the point is rats can also chew on wires pre-soy-based components as well, correct? That's correct, Your Honor. So if I understand Judge Kleinfeld correctly, there has to be some type of allegation that soy-based components attract rats at a greater rate than the old wiring would have. Yes, Your Honor. And the complaint makes allegations that are supported by documents showing that as a result of the soybean wiring that there has been a steady. . . As a result is the language that matters here. Look, everybody's had ordinary experience. I mean, my puppy's chewed my Wi-Fi wire with the old-fashioned plastic component. My cat used to like to climb into the chassis of my pickup truck because she liked the warmth. Animals cause trouble without soybeans. So I want to know that it's worse with the soybeans. And I want to see the facts pleaded that show that it's worse with the soybeans. Yes, and the complaint does have that, Your Honor. We've included statements from national care representatives from Toyota admitting that the soybean wiring has. . . Since you can't tell me where it is and I can't find it, I guess this is just going to be a big job for my law clerk to do what the plaintiff's lawyer didn't do, which is to show me where. In the opening briefs, Your Honor, we synthesized all of the allegations relating to the steady rise in rodent damage. We pointed to the statements from national care representatives, from service advisors, admitting that there is soybean in the wiring and that it is attracting rodents. We pointed to a September 10th market impact summary showing that there is a steady rise in increase in rodent damage as a result of the soybean wiring defect and that it's increasing the cost of ownership of these vehicles. We've already. . . Somewhere, I don't remember where, you referred to some within-Toyota document about how somebody wanted to study to see whether it was. . . that the chewing problems were any worse with the soybean wiring than they had been with the plastic-coated wiring. But I never saw anything saying that Toyota had gotten an answer to it that said, yeah, it's worse to a statistically significant degree. Did you plead that it is? Your Honor, and I know what you're talking about. You're talking about the May 2011 chewing test that was ordered by one of the wiring suppliers of Toyota. That's right. And the purpose of that test was to show which wiring did the adult mice want more. And did you plead what the facts showed, either from that test or a test your own experts might have done? The complaint was dismissed before we even got the results. The complaint was dismissed before we could obtain discovery showing what the result of the test was. That's often the way with a dismissal. But, of course, in a huge class action like this, you probably had your own experts. Did you plead some discovery of statistically significant evidence of a difference? No, Your Honor, not at this stage. Rule 8, neither Rule 8 nor Rule 9 or any authority requires the plaintiffs at this pleading stage to support their allegations with expert opinion. Well, it's not enough to say the cars are getting hurt by animals. I mean, the biggest animal cause of car damage in my state is they hit a moose. But there's not something bad about the cars that attracts moose. Moose just wreck a lot of cars. Mice and rodents wreck a whole lot of all sorts of things. And I've got to know what's worse with the soybean wiring for there to be anything here. And I get that, Your Honor. Materially worse. And I understand. The rules are very simple. We cannot make conclusory statements. We cannot merely just parrot the elements of the complaint, of the claims. We must, you know, we must support these facts with allegations. And in this case, we did. I mean, we have admissions from Toyota's own employees saying that the wiring has. No, that's not it. That's a service advisor saying he thinks that rodents are attracted to the soybeans and they're getting these soybean wiring rodent problems. But since we already know that rodents are also attracted by warm cars and by something pleasant to chew on, we don't know if it is a statistically significant difference. And that's what the service advisor can't tell us. Well, but there was also statements from national care representatives from Toyota making the same statements. So you've got a lot of statements here saying that, well, since the switch to soy-based components, rats are attracted to it because it's, I guess, the sweet smell is basically bringing in rats. But I'm kind of focused, I guess, on the same issue that Judge Kleinfeld's focused on, which is are there allegations that it is statistically significant or greater than the rate of failures due to rodent damage prior to the use of soy-based components? And if there are allegations that there is a statistical significance, an increase in damage to the vehicles that have soy-based products or to the components that got switched to soy-based products, then how much is that disparity? So those are allegations I would focus on. And to the extent that it's deficient in terms of allegations, then would you have a 9B problem in terms of specificity? Your Honor, it's – So what are the best allegations that you have in terms of the rise in repairs as a result of soy-based products? And you don't have to point me to the paragraphs or anything like that, but just because your time is short, sum up for me the best allegations that you have showing that there's been an increase in repairs. We have the September 10th, the September 2010 Market Impact Summary that identifies the vehicles who are being affected by the soybean wiring. It also discusses the rise, the steady rise in rodent damage and the steady rise in costs of owning the class vehicles because of the rise in rodent damage. Following the September 10th, the September 2010 Market Impact Summary, then there's the May 2011 chewing test that one of Toyota's suppliers ordered to determine which mice, adult mice, like better, soybeans or traditional plastic wiring. After the May 2011 chewing test, then there was a TSB, a November 2011 TSB that was issued – What's a TSB? Technical Service Bulletin. Thanks. That was issued by Toyota to its authorized dealers on how to address rodent damage. Then following the November 2011 TSB, there was – So the May 2011 test, no results came back from that. You didn't get the results, Your Honor. No, I understand that, but what I want to do is if I run a search of the complaint into these key areas that you've identified that would address causality, I would be looking for the September 2010 Market Impact Summary, and that would show me allegations of the rise in damages and the rate of repairs. I would be looking to the May 2011 test, but that's really inconclusive because there's no result. And then I'd be looking for, you're saying, the TSB issued by Toyota advising dealers on how to address this rodent damage problem. And the June 2014 Field Quality Report, that talks about – that are heavily impacted by the rodent damage and the five wiring harnesses that are heavily impacted. In addition to those, we have consumer complaints. But are there any statements in the June 2014 Field Report along the lines of, well, now there's been – because of the increase in damage or repairs, we're going to have to deal with it, anything along those lines? Yes, and basically an acknowledgment of causality. In the June 2014 report, Your Honor? In any of these pieces of evidence that you've asked me to examine. Yes. What did they say? Well, I mean, it – I mean, what did they say to distinguish it from puppies will chew anything they can find and rodents will get into any warm, chewy area? Well, I mean, there was discussion in the reports about redoing the design to prevent rodent damage. Now, what that design may be or what that change may be, we don't know at this stage. And, Your Honor, and I know I've been – Look, you've got a plausible theory here. Anybody would like a tofu dinner better than a dinner of plastic and copper, including but not limited to mice and rats. But I've got to find out whether the rats and mice are discriminating enough to say, hey, here's a tofu dinner. Well, I'll go to the car with the soybean wiring installation instead of the car with the old-fashioned plastic wiring. And I can't – I still haven't heard it. Well, there are statements from consumers that say that their vehicles that are parked outside their home, that the Toyota vehicles are the only ones being attacked. Their wiring, the wiring in the Toyota vehicles are the only ones being attacked by the rodents. So, I mean, I think we've got to look at these allegations as a whole, that if you piece together the admissions. We were lawyers before we were judges. And in a big case like this, typically before we even would file a case, we'd consult some expert and find out whether we had a case. And you're not limited to what Toyota has. Do you have anything where you hired somebody and they did a test, easy to do it with rats and mice because nobody cares if they live or die, to see whether they're more attracted to the soybean insulation wires than the plastic insulation wires? You could have pleaded that and you wouldn't need discovery for it. Well, we would, Your Honor. We would need to know what the material specifications are. We would need to get information from the wiring supplier. You just buy a junk Toyota out of a junkyard and you've got a wiring harness you can tear out and test. And that's part of the things that we need. That's part of the evidence we need to give to our evidence to come to a conclusion. Well, you could sort of try to replicate the May 2011 chewing test that you're awaiting the results on and see what the results show, whether they're more attracted to soy wires or the old-fashioned wires. But I see our questioning took you, well, not out of time, but really eight substantially into the five minutes that you wanted to reserve. So I'll put some time back up on the clock. Thank you, Your Honor. Good morning, Your Honors. Kevin Underhill representing Toyota. The court has already made a lot of the points that I would have made on the Rule 8 argument. There really is a plausible plaintiff's theory here. I mean, I go to the Thai restaurant near my chambers and sometimes I order tofu. It's a whole lot better than plastic. Well, the only thing I disagree on that with you about, Your Honor, is that it is a plausible theory under the rules in Twombly and Iqbal. Because our position is that what they have done is allege a possible explanation for a natural phenomenon that there is an obvious alternative explanation to use the language from the cases. And I guess I'll start with my analogy, which is if a rainmaker comes to town and a few days later it rains, that doesn't mean the rainmaker had anything to do with it. It's not impossible, but no one should have to wrestle much with that theory of a case. You don't need that much. I agree with you. Correlation is not causation. There's a hilarious book of graphs called Spurious Correlations to demonstrate that. However, you look at medical research, a whole lot of it is nothing but correlation to a statistically significant degree to suggest avenues for exploring causation. Is there something like that here? Is there anything in the complaint to support that? Yes. I think the answer is no. And what counsel pointed you to, I guess the first point I would make is a plaintiff is supposed to be able to allege a plausible claim without needing access to discovery, the kind of pre-filing investigation Your Honor was talking about. Here they did have some discovery because the case had gone on so long. This was the Fourth Amendment complaint, and as plaintiffs say in their briefing, they had reviewed 77,000 documents, which is where some of these came from. And the documents that you were asking about, they start at page 475 of the record, 475 to 496. And you should look at those because those are what plaintiff's counsel was relying on. And, for example, the market impact study, it does not show that there's a dramatic increase after 2008 or at any other particular period. Well, let me reference you to paragraph 180 that talks about the market impact summary that was released internally. Toyota acknowledged that certain class vehicles were exhibiting malfunctions due to rodent damage, and under the heading probable cause, Toyota acknowledged the harness for the speed sensors is being damaged by rodents. And it references a design disadvantage that allows rodent damage to occur more easily, and the issue continues to increase at a steady rate. Right, and that's the market impact. It's the causality, like whether that's tied to soy or not. I'm going to have to dig more into this market summary report. But the allegations do suggest rodent damage to components of certain class vehicles and also that it was increasing at a steady rate, and it references consumer concerns because the rodents are eating the soy-based wiring. Why isn't that enough under Rule 8? Well, first of all, it's not enough, Your Honor, because it not only fails to support the plaintiff's allegations, it's actually contradictory to it because their theory of the case is that there is a defect in the wiring insulation across all these vehicles and all the wiring in every vehicle. But the report that they're citing, that's not across the board. It's only the 2009-2010 Corolla and the Matrix, which is related. So it's a narrow, it's not all class vehicles. And, in fact, when it is pointing to this, to the design disadvantage you're talking about, it doesn't say what that is, but it specifically distinguishes that from other vehicles that are also experiencing issues of rodent damage. Are you saying that there are other vehicles with soy-based components that weren't experiencing the same problem, so that undercut the causality argument? No, I'm saying that there are other vehicles that the document doesn't actually link it to soy. It doesn't say that's the design disadvantage. It references a consumer report about soy, but it just says design disadvantage in that one particular model. I mean, if plaintiffs were right that all the vehicles have some kind of soy component in it, that the wiring insulation is all made of that, then it wouldn't distinguish between these vehicles and other vehicles that are experiencing rodent damage. In other words, the inference to draw from that document is that there's some other reason in this, there's some other reason that this particular vehicle is experiencing it. I can think of two things. One would be the soybeans in the insulation, a little bit of nutrient value, and the other would be if there's a plastic cover or something over the wiring harness in one kind of vehicle and not another. There are probably other things they haven't thought of. Any engineer could do better than me. It could be also that the vehicle, maybe the rodent, has easier access to the vehicle at that particular spot. Yeah, that would be the cover. And they're talking about a particular, that's another inconsistency, they're talking about a particular. But what I want to know is, does this report distinguish between vehicles that have the soybean insulation and vehicles that have the old-fashioned plastic insulation or doesn't it? No, it doesn't. It does not. You say it's pleaded that all the vehicles now have the soybean insulation, so if it distinguishes one type of vehicle, that would make it not the soybean? Right. If plaintiffs were, if their allegation were true, that all the vehicles were suffering from increasing. Is it undisputed that all the vehicles now use wiring that has soybean insulation? No. That's not the case. That's not true. And, again, I should emphasize the fact that plaintiffs' position here. Well, if it's not the case, I wonder if they do have enough. If only the Toyota Corolla and the Toyota Matrix have the soybean wires and the Toyota Corolla and the Matrix have more rodent damage to the wires, why isn't that enough to show that there's a plausible theory of causation and not merely a few tiny number of cases for the soybean wires attracting rodents? Well, I would look at the document because it doesn't show that. And you told me where it is, I guess. Right. The Toyota documents are 475 through 496 in the record. But I would look at all those because if you look either individually or if you look at them as a whole, they not only fail to support plaintiff's causation theory, but they actually undermine it. Plaintiffs repeatedly made allegations that actually undermine their own theory. And, Your Honor, it's not the case. Okay. I've got them here. Can you tell me where to look specifically? Sure. Okay. The market impact summary is at 475 through 477 of the record. And what it's talking about is a report that there have been reports of damage to the . . . All I see here is one Corolla, one Toyota Corolla, where the technician said that the failure was contributed to by rodents eating the soy-based wiring on this one car. Is there more? No, I don't believe so, no. I mean, plaintiffs are trying to . . . So all I've got is . . . Oh, wait, here's something at 480. Is that going to be more fruitful? No. 480 is . . . 480 is related to the same model and model year. It's just it's very limited. It's basically a response, a proposed response to this issue they've identified with the speed sensor in the . . . with damage to the speed sensor in the 2009-2010 Corolla. So this is basically a response to that customer complaint about his Toyota being damaged by the rodents? Well, the market impact summary is saying there have been more than one report. The only connection to soy is that one single anecdote that they have here. Otherwise, this is just showing reports of damage to one particular area, not wiring in general, but one particular area of the wiring in one of the 15 models that plaintiffs are alleging here. So, I mean, this undermines plaintiffs' theory because it, in fact, it says when compared with other models with reports of rodent damage, these have a design disadvantage that allows the damage to occur more easily. It doesn't say what that is, and there's multiple possible explanations. This looks like it's mainly explaining to the service people how to fix it. Right. If you're looking at the document . . . I'm looking at 480 through 488. That's called a TSB or a technical service bulletin. It tells them what to do. And, again, it's directed only at the Corolla, not these other . . . So it doesn't support plaintiffs' theory that in 2008, Toyota transitioned to some new kind of wiring, and there's been a dramatic explosion in rodent attacks across all these vehicles that they claim were identified. No, it doesn't say that. It doesn't say that. There are a couple words I can't read because of the confidential stamp, but it doesn't look like they're material. What about the so-called chewing test? First of all, what is it about the plaintiff's descriptor or label for that test that should be under seal? Frankly, I don't know that it needed to be under seal, Your Honor. Well, why is it under seal? Did Toyota seek to put it under seal? We did. I think out of an abundance of caution, these were Toyota documents. What conceivably is confidential or proprietary about a label that the plaintiffs attached to a test? I think someone . . . it was just any reference to the document. It was redacted from the public filing. I don't think the document needed to be sealed. Because it is quite descriptive. Why would Toyota be interested in a chewing test if there weren't some issue that the engineers were concerned about? Well, I think the question is what inference the plaintiffs are asking you to draw from that. So, one, it's not a Toyota document. It's one that Toyota produced from its files. It was in Toyota's file, right? Produced in 2017. We don't know when or . . . I mean, and I should make clear that Delphi, which is mentioned in the document, it supplies . . . it does supply Toyota and a lot . . . and every other manufacturer. It is . . . does not supply . . . it is not Toyota's only supplier for wiring or anything else. So, it's just one snapshot. But I think the more important thing . . . Something stimulated it, didn't it? Sure. But most likely it was these reports of people complaining about rodent damage. But the point I want to make about it is if you have a plan to test a hypothesis, that doesn't mean you agree with the hypothesis. It means you're testing it. We don't even know if . . . I don't know if this test was ever carried out or if there are results. This is a price quote for a proposed study that would . . . they were going to test not cables, but sheet samples that had . . . I mean, it's hard to tell what they were going to test. But my main point is if you . . . Right. They were going to test whether rodents were more interested in soy-based wiring than vinyl chloride wiring. Wasn't that what it really is about? Well, yes. Someone was planning to test that. But it doesn't provide much, if any, support for plaintiff's theory that this was a real problem. They're not test results. And testing a hypothesis doesn't mean that you agree with it or that you think there's anything to it. It just means you're testing it. And I also want to point out that we are using the term soybean wiring or soy-based wiring. Those are not accurate terms. In fact, the plaintiff's position, literally their position in the complaint and before this court, is that the wires are wrapped in soybeans. That is literally . . . I mean, that's not something the court has to take seriously. And not just because common sense says so, but because plaintiffs have . . . There are pictures of the wiring in the complaint that shows it's not made from soybeans. Now, if it's not literally made from soybeans, what is it they never say? The reason they never say that is because this is . . . it is made from plastic. It is plastic-based wiring. It is true that there are some additives out there. Some wiring has additives that include for color, flexibility, lots of different kind of things. It may not be pure plastic. It depends on the application. But it absolutely is disputed that all or potentially any of these vehicles have not just some soy or plant-based additive in the wiring, but certainly that it would be enough to have any effect on a rodent. And as Your Honor pointed out, they . . . counsel couldn't even identify any allegations. Not that you need a study in every case, but there are many of these complaints we see where they do . . . they have consulted an expert, and they are at least able to cite some facts supporting their belief that this is actually happening. I had trouble reading the graphs on page 490 . . . well, they run from 490 to 493. And it looks as though those graphs may be suggestive on which cars attract the most rodents. But you have to know what colors there are for intrusion, fuel-related, engine bay, and so forth, to figure out what the graphs mean. Right. Well, I think I can shed a little . . . I figured you could. What they're apparently doing is searching through field reports that relate to rodent damage. Not damage that necessarily relates to soy or anything else in the installation, just rodent damage. They're looking at these reports. And so, once you're getting that . . . And it goes a little beyond that. At 495, I think it was, it turns out another brand of car had the same kind of problem. I think it was Honda's. And what they did is they wrapped tape with red peppers in it around the wiring, and the rats don't like such spicy food. Well, sure. Yeah, I mean, there is a problem with deterring rodents. But the issue for this case is have plaintiffs alleged any facts showing that it's increased as a result of some . . . I'm trying to figure out whether this is going to be the showing of some likely causation, some differentiation between the installation with the soybean component and the installation that doesn't have the soybean component. Okay. I think I can shed a little bit of light on this. What seems to be happening is if you look on page 489 in the first paragraph, it says it appears that they searched reports of damage for keyword rodent, right? And they got, it looks like, 560 hits. So, 560 is the number. Then they say any . . . they separate it out by model, reports per model. And it says any generation over 14 reports was reviewed, which I think means they looked more closely at any model that had more than 14 reports of rodent damage, any kind. And I think the important thing to note about that is what we are talking about here is across all these vehicles, this is over a 10-year period. So, if you look, for example, at the 4Runner, this is on page 490, this is showing nine reports of rodent damage in the 4Runner over almost a decade. Now, there are more reports for things like the Camry. You would expect that because there are a lot more Camrys on the road. I think there's 35 of that. So, the yellow bars on page 490 are the ones that they're looking at more closely for rodent damage, not necessarily linked to insulation, but just rodent damage. And . . . What percentage of the vehicles is this? It's tiny. I mean, that struck me. We're talking about nine cars, and this is a big international manufacturer. The point I would make is the plaintiffs, they identify 300 consumer complaints, and they have about . . . there are about 300, 350 that they identify here. This is for . . . you know, there are 15 vehicles in the class, and this is over more than a 10-year period. And the class includes the Camry, the Corolla, the RAV4. The Camry alone, the Camry has been the best-selling car in America for the last 16 or 18 years in a row. So, there are millions of these vehicles on the roads. And so, this is not a dramatic . . . this is not a problem of epic proportions, and there is no . . . plaintiffs have not alleged any facts that show a dramatic increase since 2008, or at any . . . whenever . . . they're inconsistent as to when this transition actually happened, but they don't show any facts that demonstrate a dramatic increase, as you would expect to see if it's actually being caused by something in the wiring. You're over time. Let me see if my colleagues have any additional questions. No. Thank you very much. Thank you. Oh, I do have one. Yes. I do have one. Any reason why we shouldn't just publish our decision publicly, without concern about whether anything was labeled sealed if that got to us? I think that some of the . . . I think I would agree with Your Honor on the . . . with Judge Pauly on the chilling test, I believe. The market impact summary, the field . . . those are, I think, more proprietary internal Toyota documents, and we would at least want a chance to revisit that. But those I think the company does have some concerns about. The test document, I . . . someone was probably overzealous about that. But on those, I think we'd like a chance to address it before those are unsealed. Thank you, counsel. Thank you, Your Honor. How much time does he have left? Let's put three minutes on the clock. Your Honor, I just want to focus on what Rule 8 requires. Rule 8 requires just enough allegations to plausibly suggest an entitlement to relief at the pleading stage. To require the plaintiffs at this stage to show how likely the defect is going to manifest itself, it just doesn't seem possible without discovery. And a Ninth Circuit authority supports that position because, for example, in Woolen, this circuit held that the manifestation of a defect, nor the rate at which the defect is going to result, is necessary at the class certification stage because that goes to the extent of damages. But your consumer protection claims are subject to the heightened pleading standard under Rule 9B, correct? Correct. So under Rule 9B, all we have to do is allege the specificity of the alleged fraudulent conduct, the who, the what, the when, the where, and the how. And we've done that in this case. We have alleged the who, Toyota, the what. Wait a minute. For fraud, ordinarily you need to say what the fraudulent statement was. Where it's an omission, as you claim, you have to show why there was a duty to disclose, which is ordinarily some fiduciary duty. That's where I feel like more specificity may be needed. Under the second factor of la mandre, a defendant has a duty to disclose if the defendant has exclusive knowledge of material facts. Exclusive knowledge. It's not exclusive. Consumer Reports talks about it in your submission. Well, not the September 2010 summary. In fact, even the counsel indicated that he would like to keep that under submission or at least be able to review what we're going to publicize and not. The May 2011 chewing test, that's not accessible to the public. The field quality report is not. These hundreds of consumer complaints are not accessible to, you know, to consumers. Therefore, Well, there's always something, but you put into evidence this Consumer Reports article, how to protect your car from rodents, which has the red pepper wire tape. It's from April 2014. So the public already knows what you're saying should have been disclosed. Actually, that document is being cited in one of the reports. It's either the market impact summary or the field quality report. Yeah, I thought that was the magazine I see at the grocery store in the checkout, the Consumer Reports. Isn't that Consumer Reports, the public magazine? That Consumer Report is. But what I'm saying is that the reference in that article was inside, is either the field quality report or the market impact summary report. So the argument is they have exclusive facts. The question is whether these omitted facts are material. And whether or not an omitted fact is material is whether a consumer would deem it important in determining how to act in a transaction at issue. I think having disclosed to consumers that the wiring contains soybean, which increases the likelihood that rodents will chew on the wiring, I think any consumer would deem that important. All right. Thank you very much, counsel, for both sides for your helpful arguments in this matter. The matter will be submitted.
judges: Kleinfeld, Nguyen, Pauley